```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                    :
ANDREW LOPEZ,                                                       :   19-CV-2655 (ARR)
                                                                    :
                        Petitioner,                                 :   NOT FOR ELECTRONIC
                                                                    :   OR PRINT PUBLICATION
        -against-                                                   :
                                                                    :
WILLIAM KEYSER,                                                     :   OPINION & ORDER
                                                                    :
                        Respondent.                                 :
                                                                    X
-------------------------------------------------------------------
```

ROSS, United States District Judge:

In this petition for a writ of habeas corpus under 28 U.S.C. § 2254, petitioner, Andrew Lopez, raises three challenges to his New York State convictions for murder in the second degree and assault in the first degree. Pet. 4–7, ECF No. 1. First, he claims the prosecution's intent-to-kill evidence failed to satisfy the standard set in *Jackson v. Virginia*, 443 U.S. 307 (1979). Traverse 1–18, ECF No. 15. Second, he argues the trial court's decision to block an undercover police officer with a screen during his testimony was an unreasonable application of *Waller v. Georgia*, 467 U.S. 39 (1984). Traverse 19–24. Third, he claims the trial court's decision to admit confessions he made to two law enforcement officers were unreasonable applications of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Arizona v. Fulminante*, 499 U.S. 279 (1991). Traverse 25–30. For the following reasons, I deny Mr. Lopez's petition.

## BACKGROUND

*The Incident*

In the afternoon of October 21, 2011, Mr. Lopez was gathered with other members of the "8-Block" gang, a subset of the "Bloods," including his brother, Jonathan Carrasquillo, outside

1

their home at 1800 Pitkin Avenue in Brooklyn. Tr. 745, 825, 827, 833–34, 1014, 1130, 1207.[1] They got into an argument with members of a rival gang, the "Young Guns" (also known as the "Howard Boys" or the "Young Goons"), a subset of the "Crips," whose members reside at the Howard Houses. *Id*. at 792, 826, 834, 1131, 1207. A witness, Keith Hinton, testified that as tensions heightened he heard Mr. Carrasquillo say to Mr. Lopez that he was "tired of these n[****]s f[***]ing with us," and that petitioner should "go upstairs," "get the ratchet,"[2] and "bust their f[***]ing heads." *Id*. at 827, 836. Mr. Lopez then ran up to the roof of 1800 Pitkin Avenue and fired thirteen shots in the direction of the Young Guns. *Id*. at 590, 1004, 1207, 1386. Instead, the bullets killed Zurana Horton and injured Unique Armstead and Chayanne McKnight. *Id*. at 595, 708–09, 800–01.

*Admissions*

Police took Mr. Lopez into custody on October 24, 2011 around 6:30 p.m., and he remained at the precinct overnight. *Id*. at 1084–85, 1122–23, 1125. Around noon the following day, Assistant District Attorney ("ADA") Janet Gleeson met with Mr. Lopez to interview him. *Id*. at 1066–68, 1082–83. He was eighteen years old at the time. *Id*. at 1093. ADA Gleeson testified that after reading Mr. Lopez his *Miranda* rights and confirming that he understood them, she asked if he wished to speak to her and he said "[y]eah." *Id*. at 1072, 1086, 1088–89. The videotape of the interview also shows Mr. Lopez "softly, but audibly, agreed to speak to ADA Gleeson without an

---

[1] "Tr." refers to the trial transcript that has been filed over multiple documents in the record. Pages 1–139 are found in ECF No. 7-2; pages 140–258 are found in ECF No. 7-3; pages 259–408 are found in ECF No. 7-4; pages 409–602 are found in ECF No. 7-5; pages 603–766 are found in ECF No. 7-6; pages 767–908 are found in ECF No. 7-7; pages 909–916 were filed under seal in ECF No. 14; page 917 is found in ECF No. 13; pages 918–1106 are found in ECF No. 7-8; pages 1107–1254 are found in ECF No. 7-9; pages 1255–1384 are found in ECF No. 7-10; pages 1385–1593 are found in ECF No. 7-11; and pages 1594–1823 are found in ECF No. 7-12.

[2] Hinton testified that "ratchet" means gun. Tr. 846.

2

attorney." Suppression Decision 5, ECF No. 16.[3] While Mr. Lopez was reticent to answer questions at first, he ultimately admitted that he was the shooter and he had aimed at the Young Guns rather than the victims. *Id.*; Tr. 1091–93.

On November 13, 2011, while Mr. Lopez was held at Rikers Island Correctional Facility, Inspector Kevin Farley interviewed him to determine if his gang affiliation required that he be placed in protective custody. Tr. 1200–01. Inspector Farley never read Mr. Lopez his *Miranda* rights. *Id*. at 1206. However, Inspector Farley testified that during this interview Mr. Lopez admitted that on the day he was arrested "he was shooting at rival crew members called the Young Goons, they were outside of the school, and when he was shooting from a rooftop, he did not mean to shoot that lady." *Id*. at 1207. Inspector Farley then passed that information to the NYPD Intelligence Unit. *Id*. at 1213.

*Trial*

At trial, Mr. Lopez moved to suppress his admissions to ADA Gleeson and Inspector Farley, and the trial court denied those motions. *Id*. at 260. It issued a written decision regarding petitioner's admission to ADA Gleeson, *see* Suppression Decision, but denied petitioner's motion regarding Inspector Farley orally, Tr. 260. In its written decision, the court determined that Mr. Lopez knowingly and voluntarily waived his *Miranda* rights, concluding that "[a]lthough defendant Lopez's verbal consent was barely audible, his body language and his subsequent decision to continue answering questions confirmed that he was freely and voluntarily speaking to [ADA] Gleeson." Suppression Decision 9.

Later on, the prosecution called an undercover police officer as a witness and requested a

---

[3] The videotape was not provided in the record. I credit the state trial court's summary in its decision denying petitioner's motion to suppress.

3

*Hinton* hearing to determine if the courtroom should be sealed for his testimony. Tr. 1273. The prosecution argued that sealing was necessary because the officer had ongoing investigations in the same county where the crime occurred. *Id*. at 1274. The prosecution also argued that Mr. Lopez's family should be blocked from seeing the officer because they could reveal his identity to petitioner's brother, Kristian Lopez. *Id*. at 1281. Kristian Lopez, who was at liberty, both had threatened other witnesses and was implicated in the officer's investigations. *Id*. at 1279, 1281–82. The officer confirmed that he had ongoing investigations in the precinct and had been threatened in the past. *Id*. at 1287–93. However, he testified that he was not concerned with appearing before Mr. Lopez's parents and grandparents. *Id*. at 1294–95, 1297. Based on this testimony, the court presented two options: (1) sealing the courtroom except for Mr. Lopez's family members; or (2) putting up a screen to block the witness from everyone except the jury, the parties, and their lawyers. *Id*. at 1297–98. The court initially chose the first option, but after the prosecution objected, it ultimately ordered the second option. *Id.* at 1300, 1302. Before the officer's testimony, it instructed the jury that the screen was present "because the undercover officer is still actively pursuing undercover investigations within the resident precinct." *Id.* at 1317–18. The officer then testified to buying what is later established to be the murder weapon from a gun dealer named Kamel Drew. *Id.* at 1324–26, 1362–63.

*Conviction and Appeals*

On April 22, 2013, Mr. Lopez was convicted of one count of intentional murder in the second degree and two counts of assault in the first degree. Pet. 1. The jury found the evidence proved intentional murder beyond a reasonable doubt on a theory of transferred intent, meaning that Mr. Lopez intended to kill the Young Guns but killed Ms. Horton instead. Tr. 1563–64, 1819. On May 28, 2013, he was sentenced to twenty-five years to life for his murder conviction and

4

fifteen years for each assault conviction to run consecutively, for a total of fifty-five years to life. Sentencing Tr. 27, ECF No. 7-13.

Petitioner appealed his convictions, and on November 15, 2017 the Second Department affirmed them. *People v. Lopez*, 63 N.Y.S.3d 677 (2d Dep't 2017). The court rejected Mr. Lopez's argument that the prosecution failed to prove intent to kill by a reasonable doubt because "he [only] intended to scare off rival gang members," finding the prosecution's evidence "legally sufficient."[4] *Id.* at 678. It determined that the trial court erred in admitting Mr. Lopez's statements to Inspector Farley because he failed to read petitioner his *Miranda* rights but concluded that this was harmless error "as there was overwhelming evidence of the defendant's guilt and no reasonable possibility that the error contributed to his conviction." *Id.* It also reduced Mr. Lopez's sentences to be concurrent rather than consecutive. *Id.* As to petitioner's other arguments, it concluded without elaboration that they were "without merit." *Id.* at 679.

***The Instant Habeas***

Petitioner filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254 on April 29, 2019. Pet. 9. Judge DeArcy Hall ordered respondent to show cause why the petition should not be granted on May 17, 2019. Order to Show Cause, ECF No. 3. Respondent responded on August 21, 2019. *See* Resp't's Br., ECF No. 7. Petitioner filed his traverse on March 12, 2020. *See* Traverse. The case was reassigned to me on October 16, 2020. Order Reassigning Case (Oct. 16, 2020).

## LEGAL STANDARD

A district court may issue a writ of habeas corpus under 28 U.S.C. § 2254 to individuals

---

[4] The court also rejected his legal sufficiency arguments as to his assault convictions. *Lopez*, 155 A.D.3d at 678.

5

in state custody if their state court proceedings: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[My] review . . . is 'highly deferential' to the state courts, 'demand[ing] that state-court decisions be given the benefit of the doubt.'" *Cardoza v. Rock*, 731 F.3d 169, 177 (2d Cir. 2013) (quoting *Hardy v. Cross*, 132 S. Ct. 490, 491 (2011)). "To conclude that a state court decision involved an unreasonable application of clearly established federal law, the petitioner must show that the state court applied the law in a manner that was 'objectively unreasonable.'" *Moss v. Colvin*, 845 F.3d 516, 520 (2d Cir. 2017) (quoting *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015)). "A state court determination that a claim lacks merit is not objectively unreasonable if 'fairminded jurists could disagree on the correctness of the state court's decision.'" *Id*. (quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

Because the petitioner is proceeding *pro se*, I review his petition "with a lenient eye," *Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983), and "interpret[] [it] as raising the strongest arguments it suggests," *Then v. Keyser*, No. 19-CV-1618 (KAM), 2020 WL 6273945, at *4 (E.D.N.Y. Oct. 26, 2020) (citing *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)).

## DISCUSSION

### I. Sufficiency of Intent Evidence under *Jackson v. Virginia*

Petitioner argues his conviction for intentional murder was an unreasonable application of the sufficiency of the evidence standard the Supreme Court set in *Jackson*.[5] Traverse 1–18.

---

[5] Petitioner clarified in his traverse that he is not challenging the sufficiency of the evidence

6

*Jackson* forbids conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." 443 U.S. at 315 (citation omitted). In assessing whether Mr. Lopez's conviction was an unreasonable application of this standard, I must "view[] the evidence in the light most favorable to the prosecution," *id.* at 319, and will uphold the jury's verdict unless "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could [convict]," *United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005) (citation omitted). "[A] petitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence." *Fama v. Comm'r Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000).

Under New York law, a defendant is guilty of murder in the second degree if "[w]ith intent to cause the death of another person, he causes the death of . . . a third person." N.Y. Penal Law § 125.25(1) (McKinney 2019). A defendant intends to kill "when his conscious objective is to cause such result." *Id.* § 15.05(1).

Here, the jury found Mr. Lopez guilty of intentional murder on a theory of transferred intent: he intended to kill members of the Young Guns gang but killed Ms. Horton instead. Tr. 1563–64, 1819; *see also People v. Fernandez*, 88 N.Y.2d 777, 781 (1996) ("The doctrine of transferred intent serves to ensure that a person will be prosecuted for the crime he or she intended to commit even when, because of bad aim or some other lucky mistake, the intended target was not the actual victim." (citation and quotation marks omitted)). The prosecution's intent evidence included two admissions by petitioner that he was the shooter and was aiming at members of the Young Guns. Suppression Decision 5; Tr. 1207. It also included circumstantial

---

supporting his assault convictions. Traverse 2. Thus, respondent's arguments that such claims would be procedurally barred are moot.

7

evidence showing Mr. Lopez and other members of the 8-Block gang argued with the Young Guns right before the shooting, and petitioner's brother told him to get his gun and "bust their f[***]ing heads." Tr. 792, 826–827, 836, 1131.

Petitioner contends that this evidence proves only depraved indifference murder rather than intentional murder. Traverse 5–8. Under New York law, a defendant is guilty of depraved indifference murder in the second degree if "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." N.Y. Penal Law § 125.25(2) (McKinney 2019). A paradigm case of depraved indifference murder is when "a defendant—unconcerned with the consequences—[] fires into a crowd." *People v. Gonzalez*, 1 N.Y.3d 464, 467 (2004).

While Mr. Lopez indiscriminately fired thirteen rounds from a rooftop into the street, Tr. 590, 1004, 1207, I cannot conclude that "no reasonable jury," *MacPherson*, 424 F.3d at 187, could find he had a "conscious objective," N.Y. Penal Law § 15.05(1) (McKinney 2019), to kill Young Guns gang members that transferred to the death of Ms. Horton. The prosecution's intent evidence was not "meager." *MacPherson*, 424 F.3d at 187. Petitioner confessed twice to aiming at the Young Guns. Suppression Decision 5; Tr. 1207. These confessions were bolstered by evidence of the heated confrontation that preceded the shooting and petitioner's brother's urgings to shoot at the Young Guns.[6] Tr. 590, 595, 792, 826–827, 836, 1004, 1131, 1207, 1386. Considering this evidence together, I cannot hold that the jury's verdict of intentional murder

---

[6] This evidence outweighs petitioner's contentions that the Young Guns "had already start[ed] leaving before any shooting started" and "the area where the three victims were shot was not even remotely close in proximity to the area where the initial argument and taunts began." Traverse 7.

was objectively unreasonable.

## II. Sixth Amendment Right to Fair Trial under *Waller v. Georgia*

Petitioner argues that requiring his family members to sit behind a screen during the undercover officer's testimony was an unreasonable application of *Waller*, in violation of his Sixth Amendment right to a fair trial. Traverse 19–24. The Supreme Court has established a four-part test for determining if courtroom closure is warranted: (1) "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced" if the courtroom is not closed, (2) "the closure must be no broader than necessary to protect that interest," (3) "the trial court must consider reasonable alternatives to closing the proceeding," and (4) the trial court "must make findings adequate to support the closure." *Waller*, 467 U.S. at 48.

As to the first prong, the Second Circuit has recognized that the "safety of a police officer working undercover surely constitutes an overriding interest" under *Waller*. *Brown v. Artuz*, 283 F.3d 492, 501–02 (2d Cir. 2002); *see also Moss*, 845 F.3d at 521; *Rodriguez v. Miller*, 537 F.3d 102, 110 (2d Cir. 2008). The party moving for closure still must demonstrate a "substantial probability" that an open courtroom will imperil the officer's safety. *Moss*, 845 F.3d at 521 (citation omitted). Here, the prosecution sufficiently showed that the undercover officer was working on open investigations in the precinct where the crime took place and allowing an open courtroom could imperil those investigations. Tr. 1281, 1293, 1299. The prosecution also asserted that Mr. Lopez's brother, Kristian Lopez, was still at large and was connected to the officer's ongoing investigation into drug and gun sales in the neighborhood.[7] *Id.* at 1280–81. Petitioner argues the prosecution did not advance any interest relating to excluding his

---

[7] Petitioner claims Kristian was arrested the following day, Traverse 22, but that does not change the fact that he was at large at the time of the *Hinton* hearing.

9

grandparents, especially because the officer testified that he was not concerned about the presence of these family members. Traverse 20; Tr. 1295, 1297. But the prosecution did raise concerns that any family members might reveal information to Kristian. Tr. 1281.

As to the second prong, the Second Circuit has found limiting closure to one witness's testimony is no broader than necessary when an undercover officer's safety is the overriding interest. *See Rodriguez*, 537 F.3d at 110; *Sevencan v. Herbert*, 342 F.3d 69, 76 (2d Cir. 2003). The state court limited the closure the same way here. Tr. 1302.

As to the third prong, "trial courts are required to consider alternatives to closure even when they are not offered by the parties." *Presley v. Georgia*, 558 U.S. 209, 214 (2010). But this does not mean a state court must consider "all possible alternatives." *Moss*, 845 F.3d at 522. Here, the state trial court considered two options: limiting the testimony only to Mr. Lopez's family members or allowing the public while blocking the witness with a screen. Tr. 1297–98. It preliminary chose the former, *id*. at 1300, but then ordered the latter after the prosecution objected, *id*. at 1302. Petitioner argues that the court should have considered allowing his family to view the testimony from in front of the screen. Traverse 22. Although I agree that option would have been a logical choice, *Waller* only requires "*some* consideration of alternatives on the record, even if well short of [] explicit discussion of all possible alternatives." *Moss*, 845 F.3d at 522 (emphasis in original). By proposing two possible solutions, the trial court satisfied that standard here. *See* Tr. 1297–98.

As to the fourth prong, based on the officer's testimony, the trial court found closure justified because the officer was "still actively pursuing undercover investigations within the resident precinct," Tr. 1317–18, which is "a small confined area," *id*. at 1299. The court did not make specific findings as to Mr. Lopez's family, nor did it even note whether petitioner's family

10

lived within the precinct. But "*Waller* does not demand a higher showing before excluding a defendant's friends and family." *Rodriguez*, 537 F.3d at 108–09.[8] While state law potentially required the court to make findings as to whether Mr. Lopez's parents and grandparents lived in the area in which the officer worked to justify closure, *see People v. Nieves*, 90 N.Y.2d 426, 430 (1997) ("[T]he trial court's reasons for excluding the defendant's family must be demonstrated and documented in the record." (citation and quotation marks omitted)), "habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Thus, taking into account all four factors, I conclude the trial court applied *Waller* reasonably.

Regardless, any unreasonable application of *Waller* would have been trivial. "[T]he question of whether a particular closure implicates the Sixth Amendment turns on whether it undermines the values the Amendment is aimed to protect." *Carson v. Fischer*, 421 F.3d 83, 92–93 (2d Cir. 2005). The Second Circuit has identified four such values: "1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996).

Here, the screen did not jeopardize the trial's fairness because Mr. Lopez's family members heard the officer's testimony. Although "[d]isguising [a] witness risks lessening the [defendant's family]'s opportunity to observe the witness's demeanor and assess credibility," *Ayala v. Speckard*, 131 F.3d 62, 71–72 (2d Cir. 1997), even petitioner admits this testimony was

---

[8] In *Smith v. Hollins*, the Second Circuit reversed a district court's denial of a habeas petition under Section 2254, finding the state court failed to make particularized findings justifying blocking an undercover officer from a defendant's family with a screen. 448 F.3d 533, 540 (2d Cir. 2006). This decision, however, relied on the holding in *Yung v. Walker*, 341 F.3d 104, 111 (2d Cir. 2003), that *Waller* required a heightened standard to justify excluding family members, *see Smith*, 448 F.3d at 539. Following intervening Supreme Court precedent, the Second Circuit reversed that holding in *Rodriguez*, 537 F.3d at 108–09.

11

inconsequential and did not turn on credibility, Traverse 21–22. The officer only testified to buying the murder weapon from someone who was not involved in the incident. Tr. 1324–26. As petitioner notes, "the firearm used in the shooting was never a contested issue." Traverse 21. Moreover, while "a screen risks implying to the jury that the family or friends of the defendant in attendance are likely to be dangerous," *Ayala*, 131 F.3d at 71–72, the court instructed jury members that they should not "draw any adverse inference" from the screen, Tr. 1321.[9] Thus, even if the court had applied *Waller* unreasonably, such an error would not require habeas relief.

### III. Right to Remain Silent Under *Miranda v. Arizona* and *Arizona v. Fulminante*

Petitioner argues the trial court should have suppressed his admissions to ADA Gleeson and Inspector Farley because these officers violated his right to remain silent, as protected by *Miranda* and *Fulminante*. Traverse 25–30.

#### A. ADA Gleeson

The Supreme Court in *Miranda* enshrined suspects' right to remain silent during custodial interrogations. 384 U.S. at 479. To invoke this right and thus "cut off questioning," a suspect must state that intent "unambiguously." *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010) (citation omitted). If suspects do not invoke this right, their confessions nevertheless may be admissible if they knowingly and voluntarily waive their right. *Id*. "An implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evidence." *Id*. at 384 (citation and quotation marks omitted).

In *Berghuis*, the Supreme Court held that "not saying anything for a sufficient period of

---

[9] The record does not show that using the screen discouraged any witnesses from coming forward, encouraged perjury, or undermined the prosecutor's and judge's responsibility to Mr. Lopez. *See Peterson*, 85 F.3d at 43. The jury, the parties, and their lawyers were able to see the witness.

12

time" before making "inculpatory statements" does not unambiguously invoke a suspect's Fifth Amendment right to remain silent. *Id*. at 381–82. So long as suspects understand their rights, voluntarily answering questions is a "course of conduct indicating waiver." *Id*. at 384–385 (citation omitted).

In the interview with ADA Gleeson, Mr. Lopez never invoked his right to remain silent "unambiguously." *Id*. at 381. *Berghuis* forecloses petitioner's argument that his initial reticence to answer questions indicated he intended to invoke this right. *Id*. at 375, 382. Moreover, the state trial court determined that petitioner understood his *Miranda* rights as read to him, crediting ADA Gleeson's testimony that she heard him say so, albeit faintly, which was supported by the videotape of the conversation. Suppression Decision 9. Based on these facts, the court reasonably concluded that Mr. Lopez waived those rights, holding that "[a]lthough defendant Lopez's verbal consent was barely audible, his body language and his subsequent decision to continue answering questions confirmed that he was freely and voluntarily speaking to [ADA] Gleeson." *Id*.

Petitioner argues his situation is distinguishable from *Berghuis* because his remaining in police custody for eighteen hours before speaking to ADA Gleeson was coercive in its length, especially given that he was eighteen years old at the time. Traverse 26. The Supreme Court has determined that an interrogation is coercive if "a defendant's will was overborne by the circumstances surrounding the giving of a confession, . . . tak[ing] into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (citation and quotation marks omitted). The state trial court did not address this argument in its suppression decision, even though Mr. Lopez's counsel raised it. *See* Tr. 166–69. However, I still cannot find the

13

court's suppression decision objectively unreasonable on this point. While remaining in police custody for eighteen hours is onerous for an eighteen-year-old, courts have found confessions made after even longer periods by even younger defendants to be voluntary. *See United States v. Smith*, No. 14-CR-485 (JFB), 2015 WL 7177190, at *7 n.4 (E.D.N.Y. Nov. 16, 2015) (collecting cases). Thus, the court applied *Miranda* reasonably.

### B. Inspector Farley

Petitioner agrees with the Second Department's holding that the state court erred in denying his motion to suppress his statement made to Inspector Farley because the officer failed to read Mr. Lopez his *Miranda* rights. *Lopez*, 63 N.Y.S.3d at 678. But he argues that the court unreasonably applied *Fulminante* in concluding that this was harmless error "as there was overwhelming evidence of the defendant's guilt and no reasonable possibility that the error contributed to his conviction." *Id.*; *see* Traverse 27.

Where a state court has determined that an error was harmless, "a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable." *Davis v. Ayala*, 576 U.S. 257, 269 (2015). In making this determination, I must consider four factors: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir. 2004).

As discussed above, the prosecution presented far more intent evidence than just Mr. Lopez's statements to Inspector Farley. *See supra* Part I. As to the role of these statements, Inspector Farley testified that Mr. Lopez admitted to him that on the day he was arrested "he was shooting at rival crew members called the Young Goons, they were outside of the school, and

14

when he was shooting from a rooftop, he did not mean to shoot that lady." Tr. 1207. This admission largely repeats what Mr. Lopez already had told ADA Gleeson—a confession I already found was reasonably admitted. *See supra* Part III.A. This means Inspector Farley's testimony was not critical to the prosecution's case and was mostly cumulative. *See Perkins v. Herbert*, 596 F.3d 161, 179–80 (2d Cir. 2010). Mr. Lopez claims his statement to Inspector Farley was not cumulative but more damaging than his statements made to ADA Gleeson. Traverse 29. But any added detail in his second confession made little difference given his acknowledgments to ADA Gleeson that "he was the person who fired the shots from the roof of his building but that he didn't intend t[o] kill or injure any of the female victims, only the members of the rival gang." Suppression Decision 5.[10] Thus, the Second Department applied *Fulminante* reasonably in determining that the trial court's admission of Inspector Farley's testimony was harmless error.

## CONCLUSION

For the reasons set forth above, I deny the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254. I decline to issue a certificate of appealability because petitioner has not made a substantial showing of the denial of a constitutional right. The Clerk of Court is respectfully requested to enter a judgment accordingly and close the case.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:      November 23, 2020
            Brooklyn, New York

---

[10] The prosecution's conduct with respect to this evidence was neutral.

15